UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| KATHRYN DRYDEN,<br><br>Plaintiff,<br><br>vs.<br><br>JOSEPH GRAVES, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE SOUTH DAKOTA DEPARTMENT OF EDUCATION;<br><br>Defendant. | 3:23-CV-03005-ECS<br><br><br><br>OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

Plaintiff, Kathryn Dryden, sued Defendant Joseph Graves, in his official capacity as Secretary of the South Dakota Department of Education ("the DOE"), for violations of Title VII of the Civil Rights Act of 1964 as amended by the Pregnancy Discrimination Act of 1978 ("PDA"). Doc. 3. Dryden alleges that the DOE engaged in sex-based discrimination and retaliated against her based on her "new-mom" status. See id. The DOE now moves for summary judgment on all counts. Doc. 17. The DOE maintains that Dryden's new-mom claim is not cognizable under the PDA. Doc. 19 at 10. Dryden disagrees. Doc. 25 at 18. Because Dryden's new-mom status is not protected under Title VII, as amended by the PDA, the DOE's summary-judgment motion is granted.

I.  **Background**

Viewing the record in the light most favorable to Dryden,[1] the Court recites the following factual background:

Dryden worked as a Program Specialist I for the DOE's Child and Adult Food Care Program in Pierre, South Dakota. Doc. 27 ¶¶ 1–4. In this role, she managed compliance for about 200 daycare facilities across South Dakota. Id. ¶ 6. Part of her duties required her to visit these daycares between 15 and 25 times per year to conduct compliance reviews. Id. ¶ 7. The other part of her duties required her to conduct monthly conference calls and webinars with DOE program participants, present in-person trainings, and participate in various in-person meetings. Id. ¶ 8. When she was not traveling to conduct compliance reviews, Dryden usually worked in-person out of the Pierre Office. Id. ¶ 5. Though she did work remotely during the Covid-19 pandemic and while she received in vitro fertilization treatments. Id. In March 2021, Dryden became pregnant with her first child. Id. ¶ 9.

Two months later, Cheriee Watterson, the Director of the Child and Adult Nutrition Services Division, learned of Dryden's pregnancy. Id. ¶ 10. She informed Dryden that another employee had completed a hybrid maternity leave—where the employee worked remotely several weeks after her maternity leave ended. Id. Watterson advised Dryden to propose a similar plan for her upcoming maternity leave. Id. In response, Dryden submitted three maternity leave plans to her supervisors for approval. Id. ¶ 11. One of her plans—titled "My Ideal Scenario"—proposed working remotely for 12 weeks after her initial 12 weeks of maternity leave ended. Id. ¶ 13. The parties dispute whether Dryden represented that her sister

---

[1] See Walker-Swinton v. Philander Smith Coll., 62 F.4th 435, 438 (8th Cir. 2023) (noting that on a motion for summary judgment, the court views the facts in a light most favorable to the non-moving party).

or mother would help Dryden with childcare during her 12-weeks of remote work.  Id. ¶ 14.  Dryden, however, maintains that she never suggested that her mom or sister would help provide childcare.  Id.

Six months before Dryden's due date, Olson responded to an email from Dryden that contained her three maternity leave options, writing: "I am fine with the plans below. Have you completed your FMLA paperwork?"  Id. ¶ 16.  Watterson was also included on this email.  Id.  Based on Olson's response, Dryden believed all three of her plans had been approved, and as such, was approved to work remotely following her initial 12 weeks of maternity leave.  Id.

About a month before Dryden's due date, a meeting was scheduled to finalize her maternity leave plans.  Id.  Dryden, Watterson, and Christina Lusk—Dryden's immediate supervisor—were all in attendance.  Id. ¶ 18.  At the meeting, Dryden expressed her desire to utilize her "ideal scenario" plan.  Id. ¶ 19.  While no final decision was made, the three agreed to revisit the subject after Dryden's first 10 weeks of maternity leave.  Id. ¶ 20.  About a week before Dryden began her FMLA leave, she learned that Lusk also planned to have a hybrid maternity leave.  Id.

Dryden began her 12 weeks of maternity leave on November 9, 2021.  Id. ¶ 21.  About six weeks into Dryden's maternity leave, Mikayla Hardy—Lusk's interim replacement—texted her, "Good Afternoon! This is [Hardy] . . . I just wanted to check in with you and see if you had given any thought to your return to work plans?"  Id. ¶ 22.  Dryden responded, "Hey there! I am planning to maintain what we had discussed before I went on leave."  Id.  Dryden also told Hardy that her baby took long morning and afternoon naps, "which will make things a lot easier."  Id.  Hardy replied, "Awesome! Sounds good."  Id.

On January 20, 2022, Hardy again texted Dryden to check in with her and confirm that she would be returning to work on February 1, 2022—the first day after her 12 weeks of maternity leave. Id. Dryden responded, "Yes I will be returning on February 1." Id. ¶ 23. Dryden assumed that Hardy meant that she would return to work remotely because she had no reason to believe that the DOE had denied her hybrid maternity plan to work remotely for another 12 weeks. Id.

A few days before her maternity leave ended, Dryden brought her new baby into the DOE office to visit and socialize with her co-workers. Id. ¶ 24. During that visit, Dryden discussed with Watterson her plan to return to work remotely. Id. ¶ 25. She also mentioned that her infant would be present while she worked. Id. Dryden did not mention that her mother or sister would be present to care for the newborn. Id. ¶ 26. At this time, Dryden had planned to send her daughter to daycare beginning in May, or as early as March 7, 2022. Id. ¶ 28.

The day before Dryden was to start working remotely, Hardy texted her to ensure "[they] were on the same page about tomorrow and make sure [she] ha[d] everything [she] need[ed]." Id. ¶ 30. Hardy also texted Dryden that she had Dryden's previous maternity plans and wanted to know if she had anything more recent. Id. A phone call between the two ensued. Id. During this call, Hardy informed Dryden that she and Watterson decided that Dryden could not work remotely while also caring for her newborn. Id. Hardy advised Dryden that if she did not return to the office, she would lose her job. Id. Dryden felt blindsided. Id. Given the shortage of daycare providers in Pierre, Dryden did not believe she could find childcare on a day's notice. Id. So Dryden told Hardy that she would have to tender her two weeks' notice if she could not work from home. Id. Dryden maintains she did not want to quit and that she responded in the heat of the moment. Id.

4

After the phone call, Dryden contacted Darin Seely, the Commissioner of the Bureau of Human Resources and Administration ("BHR"), as well as staff at Governor Kristi Noem's office, claiming she had been "forced out of [her] job." Id. ¶ 31.  Seely told Dryden he would look into the situation and that he knew of staff currently working from home with children present. Id.  He also directed Dryden to return to work remotely and schedule a meeting with Watterson and Hardy. Id.

The next day, Olson, Watterson, and Hardy met with Dryden via Zoom to address her request to work remotely. Id. ¶ 32.  During this meeting, Olson informed Dryden that her request would not be approved because it would lead "every new mom" to ask to work from home. Id.  Olson added that the DOE's Remote Work Policy[2] did not allow employees to work from home with a kid present and asked Dryden if she could get daycare. Id.  Dryden told them she had daycare arranged for March 7, 2022. Id.  Dryden's supervisors ultimately gave her until February 14 to return to the office and instructed her to provide a plan to meet that goal by February 11. Id.  In the meantime, Olson directed Dryden to not work and told her that she could either use accrued leave or take leave without pay. Id.  Dryden needed time to consider her options, so Olson gave her until February 3 to share her plans for February 4 through February 11. Id.  Olson later told Dryden that she could take additional leave without pay until March 7, if she agreed to not work remotely. Id. ¶¶ 32–33.

---

[2] This policy was implemented in 2019. Id. ¶ 43.  The parties dispute whether Dryden's supervisors strictly adhered to the policy. Id. ¶ 44.  To work remotely, the policy requires employees to complete a written Remote Work Request. Id. ¶ 45.  Dryden, however, had worked remotely many times without first filling out the request. Id. ¶ 50. The policy explains that "remote work hours are regular work hours and are not a substitute for dependent care." Id. ¶¶ 44, 48. The policy, however, does not apply to remote work done "on a short-term basis as a temporary reasonable accommodation." Id. ¶ 44.  Eligibility for remote work is to be determined on a case-by-case basis. Id.

5

On February 3, Dryden emailed Hardy, Olson, and Watterson, informing them that she failed to locate daycare options before March 7 and would not be returning to work in-person until that time. Id. ¶ 34. She agreed she would not work in the interim. Id. ¶ 36.

On February 8, Hardy called Dryden to discuss her employment. Id. ¶ 37. Dryden submitted her letter of resignation the next day. Id. ¶ 39. The parties dispute Dryden's reason for resigning. Dryden claims she was displeased with Hardy and Watterson's denial of her ideal maternity plan, which she believed had already been approved. Id. Dryden maintains that she was "forced out" of her job by Hardy because Hardy told her during this February 8 phone call that she was being placed on "permanent leave without pay." Id. ¶ 37.

Dryden filed a Charge of Discrimination in June 2022 with the EEOC. Id. ¶ 51. On August 22, 2022, the DOE offered to reinstate Dryden to her previous position, but she declined. Id. ¶ 51. On March 31, 2023, Dryden filed her Complaint with this Court. Doc. 1. On April 4, 2023, she filed an Amended Complaint alleging that the DOE discriminated against her based on her sex in violation of Title VII. Doc. 3. Dryden also claims the DOE retaliated against her for complaining about being treated less favorably regarding remote work arrangements because of her sex. Id.[3] Dryden maintains, however, that no one discriminated against her while she was pregnant. Doc. 27 ¶ 41.

## II. Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the

---

[3] Although briefed by the DOE, Dryden does not assert a hostile work environment claim. See Doc. 25 at 1 n.1.

evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (citation omitted).  A genuine issue of material fact exists if a "reasonable jury [could] return a verdict for either party" on a particular issue.  Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).  A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed.  Fed. R. Civ. P. 56(c)(1); see Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012).  "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment."  Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007).  Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Cases alleging discrimination are subject to the same summary judgment standard as any other case.  Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc).

**III.   Discussion**

    **A.  Sex Discrimination**

Dryden alleges the DOE discriminated against her on the basis of her sex in violation of Title VII.  Doc. 3 at 7–8.  Title VII prohibits employers from "discharg[ing] any individual, or otherwise discriminat[ing] against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  The PDA amended Title VII and expanded the scope of sex-based

7

discrimination to include discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

To survive summary judgment on a sex-based discrimination claim, a plaintiff must show "either direct evidence of discrimination or evidence . . . sufficient to create an inference of discrimination under the McDonnell Douglas burden shifting framework." Robinson v. Am. Red Cross, 753 F.3d 749, 754 (8th Cir. 2014) (alteration in original) (quoting Butler v. Crittenden Cnty., 708 F.3d 1044, 1048 (8th Cir. 2013)). "[D]irect evidence is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." Torgerson, 643 F.3d at 1044 (quoting Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997)). "If a plaintiff lacks direct evidence, the McDonnell Douglas framework applies." Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1046 (8th Cir. 2005) (Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)).

"Under McDonnell Douglas, [a plaintiff] must establish a prima facie case of sex discrimination." Id. (Shannon v. Ford Motor Co., 72 F.3d 678, 682 (8th Cir. 1996)). If a plaintiff establishes a prima facie case of discrimination, the burden then shifts to the employer to "proffer a legitimate, nondiscriminatory reason for the adverse action." Kratzer, 398 F.3d at 1046 (citing Shannon, 72 F.3d at 682). If the employer supplies such a reason, the plaintiff "must establish that 'the defendant's proffered reason is pretextual and that intentional discrimination was the true reason for the defendant's actions.'" Id. Because Dryden has not provided direct evidence of sex-based discrimination, the Court analyzes her claims under the McDonnell Douglas framework.

Dryden's claims stem from the DOE's characterization of her as a "new mom." Doc. 3 ¶¶ 44, 48; Doc. 25 at 17–25. Dryden maintains the DOE viewed her "in a monolithic category of women driven to a level of unusual distraction by physical proximity to their babies." Doc. 25 at 20. The Eighth Circuit, however, has held that "claim[s] of discrimination based on [an employee's] status as a new parent [are] not cognizable under the PDA." Piantanida v. Wyman Ctr., Inc., 116 F.3d 340, 342 (8th Cir. 1997). Dryden acknowledges Piantanida but maintains that it "deserves to be reconsidered" because it was "decided more than thirty years ago in an entirely different world of work." Doc. 25 at 22. This Court, however, has no power to "reconsider" Piantanida as Eighth Circuit decisions "are binding on district courts within its territory 'until overruled by [the] court en banc, by the Supreme Court, or by Congress.'" Piper v. Att'y Gen., 682 F. Supp. 3d 740, 768 (D.S.D. 2023) (alteration in original) (quoting M.M. ex rel. L.R. v. Special Sch. Dist. No. 1, 512 F.3d 455, 459 (8th Cir. 2008)).

Dryden tries to distinguish her case from Piantanida by asserting that she was discriminated against based on her gendered new-mom status instead of her gender-neutral parental status. Doc. 25 at 20. Dryden thus maintains that her case is "based on sex because it was [her] supervisors who decided that [she] was a 'new mom' . . . and this categorization [is] biologically limited to women." Id. Dryden's alleged distinction, however, is identical to the facts in Piantanida, where the plaintiff was told by a supervisor that "she was being given a position 'for a *new mom* to handle.'" 116 F.3d at 341 (emphasis added).[4] Plain and simple, this

---

[4] This Court determines that Piantanida prohibits Dryden from morphing her claim into a distinguishable "sex-plus" claim on the account that she is a woman who recently gave birth (i.e., new mom). "'Sex-plus' discrimination occurs when employees are classified on the basis of sex plus one other seemingly neutral characteristic." Doucette v. Morrison Cnty., Minn., 763 F.3d 978, 985 (8th Cir. 2014) (quoting Knott v. Mo. Pac. R. Co., 527 F.2d 1249, 1251 (8th Cir. 1975)). "'[S]ex-plus' discrimination claims must be premised on gender." Id. But a plaintiff will "never be successful unless there is a corresponding sub-class of members of the opposite

9

is a "new parent" case that the Eighth Circuit has held to be not cognizable under Title VII. See id. at 340–42 (A new-mom claim "is not cognizable under the PDA."); Ames v. Nationwide Mut. Ins., No. 11-CV-00359, 2012 WL 12861597, at *9 (S.D. Iowa Oct. 16, 2012) ("[D]iscriminating against [an employee] on account of her status as a parent would not be discrimination 'because of or on the basis of [her] pregnancy, childbirth, or related medical conditions.'" (last alteration in original) (quoting 42 U.S.C. § 2000e(k))), aff'd, 760 F.3d 763 (8th Cir. 2014).

Because an employee's parental status is not protected under the PDA, Dryden has failed to make a prima facie showing of discrimination. See Piantanida, 116 F.3d at 342; Ames, 2012 WL 12861597, at *9. And even if Dryden had established a prima facie case of discrimination, the DOE has articulated a nondiscriminatory, legitimate justification for its actions. The DOE justified its conduct by maintaining that it would not be feasible for Dryden to work remotely from home while also being the sole caretaker of her child during work hours. Doc. 27 ¶ 29. The DOE did not violate Title VII by preventing Dryden from working remotely while caring for her child because the DOE's actions were based not on gender but on productivity—a legitimate concern for any business.[5] See Wensel v. State Farm Mut. Auto. Ins., 218 F. Supp. 2d 1047,

---

gender." Id. To the extent that Dryden's sex-plus claim is not foreclosed by Piantanida, her claim still fails as she has not established a corresponding sub-class of members of the opposite gender, which she claims she does not have to establish. See Doc. 25 at 18 (Dryden arguing that she "does not have to show that she was treated differently than similarly situated males, and she can establish her claim of discrimination even though all of [her] supervisors . . . [are] women"); Philipsen v. Univ. of Mich. Bd. of Regents, No. 06-CV-11977, 2007 WL 907822, at *4, *8, *9 (E.D. Mich. Mar. 22, 2007) (rejecting sex-plus claim premised on plaintiff's "status as a woman with small children" because there was "no evidence that [p]laintiff was treated differently than . . . males with young children" and allowing her to argue that defendant "discriminated against her as compared to women without young children would turn this gender discrimination case into a parental discrimination case").

[5] To be clear, this Court is not making a negative finding about Dryden's employment history with the DOE. And, to be sure, this record would not support such a finding.

10

1061 (N.D. Iowa 2002) (determining that "comments regarding the effect of child-rearing on an [employee's] productivity were clearly not based on gender [and] . . . . [t]his type of discrimination . . .is not prohibited by the PDA").

Dryden also raises issues about whether the DOE had agreed to her hybrid maternity leave plan and later breached that agreement, thereby forcing Dryden to decide between taking unpaid leave or returning to the office despite not yet having child-care arrangements.  This, however, does not raise a genuine dispute of material fact under the claims she asserts because "[a]n employer's discrimination against an employee who has accepted this parental role—reprehensible as this discrimination might be—"is not sex-based discrimination in violation of Title VII.  Piantanida, 116 F.3d at 342.  Ultimately, Dryden has not established a material question of fact about pretext because she has not shown that the DOE's nondiscriminatory explanation is dubious or that the DOE's actions were actually motivated by a prohibited reason.  Torgerson, 643 F.3d at 1047; see Wilking v. Cnty. of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998) ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether that reason was wise, fair, or even correct . . . so long as it truly was the reason for the plaintiff's termination." (citation omitted)); Clay v. Hyatt Regency Hotel, 724 F.2d 721, 725 (8th Cir. 1984) ("While an employer's judgment may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was pretext for illegal discrimination." (citation omitted)).  Accordingly, Dryden's claim must fail.

To be clear, the Court is not condoning the DOE's actions here.  The Court simply determines, in accordance with settled Eighth Circuit precedent, that an employer's discrimination based on an employee's parental status does not violate Title VII.  Thus, summary judgment is granted in the DOE's favor on Dryden's sex-based discrimination claim.

B. Retaliation

Dryden next alleges that she experienced illegal retaliation. Doc. 3 at 9–10. Title VII prohibits employers from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); see also Lewis v. Heartland Inns of Am., L.L.C., 591 F.3d 1033, 1042 (8th Cir. 2010).

> The burden shifting McDonnell Douglas analytical framework applies to this inquiry as well, beginning with the three elements of a prima facie case of retaliation, whether: (1) the plaintiff engaged in protected conduct, including opposition to an action prohibited by Title VII; (2) she was subjected to an adverse employment action, and (3) there is a causal nexus between the protected conduct and the adverse action.

Lewis, 591 F.3d at 1042 (cleaned up).

To satisfy the first element, a plaintiff must establish that she "oppos[ed] an act of discrimination made unlawful by Title VII" or "participat[ed] in an investigation under Title VII." Lopez v. Whirlpool Corp., 989 F.3d 656, 664 (8th Cir. 2021) (alterations in original) (quoting Hunt v. Neb. Pub. Power Dist., 282 F.3d 1021, 1028 (8th Cir. 2002)). To do this, a plaintiff "must show 'an objectively reasonable belief that an actionable Title VII violation has occurred for [her]'" activities to be protected. Id. (alteration in original) (quoting Gibson v. Concrete Equip. Co., 960 F.3d 1057, 1064 (8th Cir. 2020)). Courts "use the applicable substantive law to analyze reasonableness." Id. (citing Gibson, 960 F.3d at 1065). To satisfy the second element, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 664–65 (quoting AuBuchon v. Geithner, 743 F.3d 638, 642 (8th Cir. 2014)). "The core question in a

12

retaliation case does not, ultimately, concern the veracity of the facts underlying an employer's legitimate non-discriminatory reason for discharging its employee, but rather concerns whether 'the employment decision was based upon intentional discrimination.'" Stuart v. Gen. Motors Corp., 217 F.3d 621, 637 (8th Cir. 2000) (quoting Ryther v. KARE 11, 108 F.3d 832, 837–38 (8th Cir. 1997)).

Dryden claims there are material issues of fact that support her retaliation claim. Doc. 25 at 28–30. She maintains that Hardy almost got her to quit after the January 31, 2022 phone call. Id. at 29. Dryden asserts that she did not want to quit and tried to remedy the situation by complaining to BHR Commissioner Seely and Governor Noem's office, who each called Hardy, Watterson, and Olson instructing them to work something out with Dryden. Id. Dryden specifically contends that she was retaliated against "for contacting the Commissioner of BHR and the Governor's Office." Doc. 20-1 at 7.

The DOE, on the other hand, maintains that summary judgment is appropriate because Dryden's alleged protected activity—going to the BHR Commissioner and Governor's office— occurred *after* the conduct she alleged was retaliatory. Doc. 30 at 16. The DOE also contends that Dryden "did not suffer a materially adverse employment action." Id.

Dryden has failed to show that she engaged in protected conduct or that there was a causal connection between the alleged protected conduct and her alleged adverse employment action. Dryden, in her Amended Complaint, alleges that she "opposed discrimination when she complained to the Defendant that she was being treated less favorably about leave and remote work assignments on the basis of her sex as a 'new mom.'" Doc. 3 ¶ 53. She admitted the same during her deposition. Doc. 20-1 at 7 (alleging that she was retaliated against based on her new-mom status and improperly prohibited from working "remotely while being the sole

13

caregiver for a newborn"). As stated above, Dryden's new-mom status is not protected under longstanding Eighth Circuit precedent. See Piantanida, 116 F.3d at 342. Thus, Dryden did not have an objectively reasonable belief that an actionable Title VII violation occurred. See Lopez, 989 F.3d at 665 (holding that plaintiff did not engage in protected activity when she failed to "tie [her] complaint to any discrimination, let alone sex discrimination"); Hunt, 282 F.3d at 1028–29 (same). Consequently, Dryden also fails to show a causal nexus between protected conduct and the alleged adverse action.

Furthermore, the alleged protected conduct—complaining to BHR Commissioner Seely and the Governor's Office—took place *after* Hardy told Dryden that a remote work arrangement would not be authorized if she was providing dependent care during her work. Doc. 20-1 at 7. "[A]lleged retaliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event." Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1044 (8th Cir. 2007). Dryden's "statements to [Commissioner Seely], which occurred after she was [told that she could not work remotely while caring for a child], cannot serve as protected conduct that [the DOE] retaliated against because there is no causal connection between [Dryden's complaints to the Commissioner and the Governor's Office] and [the DOE's] decision to" deny her the ability to work remotely. Deyo v. Sec. First Bank, No. 23-CV-05012, 2025 WL 775792, at *11 (D.S.D. Mar. 11, 2025). Thus, Dryden fails to make a prima facie case of retaliation; as such, summary judgment is granted in the DOE's favor.[6]

---

[6] Given this Court's determination on Dryden's retaliation claim, it need not determine whether Dryden was constructively discharged. Dryden does not bring a constructive discharge claim. See Doc. 3 (Amended Complaint stating only two claims: sex discrimination and retaliation); Doc. 25 (Dryden arguing that her two claims should survive summary judgment). Dryden alleges she was constructively discharged solely to prove the second element of her retaliation claim—that she suffered an adverse employment action. Doc. 25 at 27 ("To prove a constructive discharge as an adverse employment action in a Title VII case, the plaintiff must show . . . .");

IV. Order

For the above reasons, and the record as it now exists before this Court, it is hereby

ORDERED that the DOE's Motion for Summary Judgment, Doc. 17, is granted. It is further

ORDERED that Dryden's claims are dismissed with prejudice.

DATED this 4th day of June, 2025.

BY THE COURT:

ERIC C. SCHULTE
UNITED STATES DISTRICT JUDGE

---

see West v. Marion Merrell Dow, Inc., 54 F.3d 493 (8th Cir. 1995) (reversing district court's verdict in plaintiff's favor on her retaliation claim because she was not constructively discharged). And even if Dryden made an independent constructive discharge claim, it would fail as she cannot prove that her "resignation was a reasonably foreseeable consequence of their employers' discriminatory actions." Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Loc. No. 101, 3 F.3d 281, 285 (8th Cir. 1993). Again, Dryden's new-mom status is not protected by Title VII. Piantanida, 116 F.3d at 342.